The People of the State of New York ex rel. HARRY´A. VOGELSTEIN, Relator, *v.* The Warden of the County Jail of the County of New York, Respondent.

Supreme Court, New York County, March 7, 1934.

*James D. C. Murray,* for the relator.

*William C. Dodge, District Attorney [Lyon Boston* and *Erwin N. Schapira* of counsel], for the respondent.

SHIENTAG, J.  This is a proceeding by way of writ of habeas corpus to test the validity of an order made by a judge of the Court of General Sessions committing the relator to the county jail for contempt for refusing to answer certain questions before the grand jury after being ordered to do so by the court.

The relator is an attorney.  He appeared in the Magistrates'

Court and in the Court of Special Sessions on behalf of fifteen defendants charged with violation of sections 974 and 975 of the Penal Law relating to the keeping of a place for the game of policy, the collection of money for lottery policies and the possession of policy slips. Twelve of the defendants pleaded guilty and were fined. The cases of the remaining three are still pending. On information that there was a systematic, organized movement to violate this law, the grand jury of the county of New York commenced an inquiry into the entire subject. Its power to conduct such an inquisition is not questioned. Eleven of the fifteen defendants for whom the relator had previously appeared came before the grand jury, voluntarily waived the attorney-client privilege, and testified that they did not retain the relator in the criminal proceedings which had been instituted against them; that they did not know him and did not pay him for his services.

The relator was thereupon called before the grand jury. He was told of the testimony given by the eleven defendants whom he had purported to represent and was asked to give the name and address of the man who employed him to appear for them. This he declined to do on the ground that the identity of the man he claimed to be his client was a privileged communication, which he as an attorney could not disclose in the absence of the client's waiver. He was not asked what was said by the alleged client nor was he questioned with respect to the circumstances under which he was retained. Originally the relator gave the impression that it was an outsider, not one of the fifteen defendants charged with crime, who retained him to represent the entire group. Later he clarified his position and stated that he had been retained by one of the fifteen defendants, by one of those who had not pleaded guilty and whose case had not been disposed of. He declined to give the name and address of his alleged client, although ordered to do so by the judge presiding, and was committed to the county jail and fined for contempt.

Under the circumstances here presented the question as to whether the attorney was obliged to give the address of his client becomes academic. All of the fifteen defendants have been in custody and their addresses are now matters of record. In view of the fact that the parties desire a prompt decision I shall not send the case back for the correction of the record but shall assume, as the relator has definitely indicated, that he will decline to disclose the name of his employer or client. This opinion will be directed to that one phase of the case.

The relator declined to answer, before the grand jury, on the ground that the name of the client who retained him was a privileged

communication, and that if disclosed it might tend to incriminate his client. We are not here concerned with the privilege against self-incrimination. Only the witness or party himself may urge that immunity. The attorney can only refuse to testify if the matter concerning which inquiry is made constitutes a confidential communication between himself and his client.

The attorney-client privilege is not one which is guaranteed by the Constitution. It is a statutory provision which embodies in substance the common-law rule. It is subject to the will and control of the Legislature. The same body which confers the privilege may regulate it, may modify it, if indeed it may not abolish it altogether.

Section 353 of the Civil Practice Act provides that " an attorney or counselor at law shall not be allowed to disclose a communication, made by his client to him, or his advice given thereon, in the course of his professional employment, nor shall any clerk, stenographer or other person employed by such attorney or counselor be allowed to disclose any such communication or advice given thereon."

The question is whether this statutory privilege applies to the situation here disclosed.

While the statute does not expressly provide that the communication shall be confidential, the courts have always so interpreted it. The privilege " rests not only upon the professional character of the employment, but also upon the confidential nature of the communication." (*Baumann* v. *Steingester*, 213 N. Y. 328, 333; *People* v. *Buchanan*, 145 id. 1, 26; *Avery* v. *Lee*, 117 App. Div. 244, 247.)

The privilege is one of ancient origin. It is recognized in the civil law and finds its place in the codes of continental countries. (Radin, The Privilege of Confidential Communication between Lawyer and Client, 16 Cal. Law Rev. 487.) In England it goes back to the reign of Elizabeth. Originally its basis was the honor of the attorney rather than the apprehension of his client. Under the original theory the privilege did not exempt the client himself. It could be waived by the attorney since only his honor was involved. This doctrine was subsequently repudiated entirely. The new theory " looked to the necessity of providing subjectively for the client's freedom of apprehension in consulting his legal adviser and proposed to assure this by removing the risk of disclosure by the attorney even at the hands of the law." (Wigm. Ev. § 2290.)

Under the new theory it was the privilege of the client; the attorney could not waive it; only the client could do so. Not alone were the attorney's lips sealed, but the client himself could not be compelled to testify to the confidence. Originally the

privilege was limited to communications received since the beginning of the litigation and for the purposes of the litigation only. Gradually the privilege was extended to all communications made by a client in confidence to his attorney, whether they related to any suit then pending or contemplated or to other matters proper for professional advice. The seal of secrecy was placed not alone on communications made by the client, but on the advice given by the attorney. (*Bacon* v. *Frisbie*, 80 N. Y. 394; *Root* v. *Wright*, 84 id. 72.)

While its soundness has not been unchallenged, the privilege is so ingrained in our law that for centuries it has been steadily upheld. (Bentham, Rationale of Judicial Evidence, quoted in Wigm. Ev. § 2291; Lord LANGDALE in *Flight* v. *Robinson*, 8 Beav. 22, 36.)

The policy of the privilege has been the subject of much discussion. It is summed up by Wigmore as follows: " In order to promote freedom of consultation of legal advisers by clients, the apprehension of compelled disclosure by the legal advisers must be removed; and hence the law must prohibit such disclosure except on the client's consent." (Wigm. Ev. § 2291.)

Phillips, an early writer on the law of Evidence, said: " The expediency of this rule must depend, not on the impropriety of violating the confidence reposed, but on a consideration that the collateral inconvenience, which would ensue if no such confidence were reposed, would preponderate over the direct mischief produced by a chance of the failure of justice resulting from the exclusion of the evidence." (1 Phillips Ev. 134.)

A review of the decisions clearly indicates that it was not the purpose of the privilege to shield guilt. Its primary object was to secure the orderly administration of justice by insuring frank revelation by the client to the attorney without fear of a forced disclosure; in other words, to promote freedom of consultation. To be sure the exercise of the privilege may at times result in concealing the truth and in allowing the guilty to escape. That is an evil, however, which is considered to be outweighed by the benefit which results to the administration of justice generally.

There is nothing in the books to show that the privilege was to extend to the fact of the retention of counsel. No point is made that the employment of counsel should be shrouded with secrecy. The retention of counsel was to call the privilege into operation. The privilege itself was to extend only to communications between a client and an attorney who had been retained. The name or identity of the client was not the confidence which the privilege was designed to protect; the statements of the client

for the purpose of seeking advice from his counsel were the disclosures which were to be kept secret. As Lord ESHER, M. R., succinctly put it: " The client does not consult the solicitor with a view to obtaining his professional advice as to whether he shall be his solicitor or not." (*Bursill* v. *Tanner*, L. R. 16 Q. B. Div. 1, 4.) The mere fact of the engagement of counsel is out of the rule because the privilege and duty of being silent do not arise until that fact is ascertained.

" What a solicitor is privileged from disclosing," said JAMES, L. J., " is that which is communicated to him *sub sigillo confessionis* — that is to say, some fact which the client communicates to the solicitor for the purpose of obtaining the solicitor's professional advice and assistance; the principle being, that such communications ought to be privileged, because otherwise a man would be deterred from fully disclosing his case, so as to obtain proper professional aid in a matter in which he is likely to be thrown into litigation." (*Ex parte Campbell*, L. R. 5 Ch. App. 703, 705.)

In *Levy* v. *Pope* (Moody & Malkin, 410) the Attorney-General, in order to prove the real defendant, called the attorney who conducted the defense and asked him who employed him to defend the case. PARKE, J., ruled: " He may be asked between whom the relation exists to shew who is the real defendant, in order that his acts and declarations may be admitted."

Where the privilege is claimed, the attorney must name an actual client in order to prove the existence of the relationship; otherwise no lawyer could ever be questioned as to any fact, since he might always claim that he had learned it from a client whose very existence he need not show.

The case of *United States* v. *Lee* (107 Fed. 702) would seem to be directly in point. There a defendant, admitted to bail, could not be found and on investigation by the grand jury it appeared that his counsel was not retained by the accused but by some person acting for him or in his interest. The court held that counsel would be compelled to disclose the name of such person.

" The court has a right to know that the client whose secret is treasured is actual flesh and blood, and demand his identification, for the purpose, at least, of testing the statement which has been made by the attorney who places before him the shield of this privilege. The declination of the answer because a man imparted the desired information who stood in the relation of a client justifies the testing of questions relating to the client's actual identity and existence." (*United States* v. *Lee, supra*, 704.)

In an early case, Chief Justice DOE, of New Hampshire, held: " The objection, that evidence is a disclosure of a privileged com-

munication between attorney and client, is founded on the proof of the fact that the relation of attorney and client existed. The existence of that relation is not a privileged communication." (*Harriman* v. *Jones*, 58 N. H. 328.)

" It is only a communication made because of, and in the course of the confidential relation of client and attorney, which is privileged. A mere request by one to an attorney to become and act as his attorney, is not made because of such relation, but for the purpose of creating it." (*Eickman* v. *Troll*, 29 Minn. 124.)

The great weight of authority in England and in this country is that the client's identity does not come within the scope of the privilege. (*Martin* v. *Anderson*, 21 Ga. 301; *Fowler* v. *Sheridan*, 157 id. 271; *Alden* v. *Goddard*, 73 Me. 345; *Leindecker* v. *Waldron*, 52 Ill. 283; *Richards* v. *Richards*, 64 Misc. 285; affd., 143 App. Div. 906; *Catalog Assn.* v. *Eberly's Sons*, 50 F. [2d] 981; *Matter of King* v. *Ashley*, 96 App. Div. 143; affd., 179 N. Y. 281; *99 Plaintiffs* v. *Vanderbilt*, 1 Abb. Pr. 193; *Arkansas City Bank* v. *McDowell*, 7 Kan. App. 568; *Satterlee* v. *Bliss*, 36 Cal. 489; *Collins* v. *Hoffman*, 62 Wash. 278; *Shaughnessy* v. *Fogg*, 15 La. Ann. 330; *Turner's Appeal*, 72 Conn. 305; *Mobile & Montgomery Ry.* v. *Yeates*, 67 Ala. 164; *White* v. *State*, 86 id. 69, 75; Wigm. Ev. § 2313; Greenl. Ev. § 245; *Chirac* v. *Reinicker*, 11 Wheat. 280, *semble; Beamer* v. *Darling*, 4 Upp. Can. Q. B. Rep. 249; *Parkhurst* v. *Lowton*, 2 Swanst. 194, 201; *Bursill* v. *Tanner*, [1885] 16 Q. B. Div. 1; *Gillard* v. *Bates*, 6 M. & W. 547. Contra, *Ex parte McDonough*, 170 Cal. 230; but see the strong dissenting opinion which, it is submitted, represents the correct view.)

Although the privilege against self-incrimination is not here directly involved, it is urged that the disclosure of the name of the alleged client should not be ordered because it may result in his conviction of a crime. That, however, is no reason for extending the scope of the privilege. An analogy may be found in the absolute right of an accused person against testifying on his own trial, than which there is no more zealously guarded privilege known to the law. In interpreting that privilege the courts have looked to the history of the constitutional provision involved (State Const. art. 1, § 6). Notwithstanding the constitutional immunity, " a murderer may be forcibly taken before his dying victim for identification, and the dying declarations of his victim may then be proved upon his trial for his identification. A thief may be forcibly examined and the stolen property may be taken from his person and brought into court for his condemnation. A prisoner's person may be examined for marks and bruises, and then they may be proved upon his trial to establish his guilt; and it would be

stretching the constitutional inhibition too far to make it cover such cases * * * and the inhibition thus applied would greatly embarrass the administration of justice." (*People* v. *Gardner*, 144 N. Y. 119, 128.) So in the case just cited it was held proper to compel a defendant to stand up for purposes of identification.

After the arrest of certain defendants their shoes were taken from them and placed in footmarks leading to the house of the deceased made in the newly fallen snow on the night of the murder. The shoes corresponded with the footprints and evidence of that fact was allowed against the objection that the seizure of the shoes and their comparison with the footprints compelled the defendants to be witnesses against themselves and violated their constitutional safeguard. (*People* v. *Van Wormer*, 175 N. Y. 188.)

Each one of these acts tended to incriminate the defendant and to lead to his conviction; nevertheless, in the light of its history, the constitutional inhibition was held not to apply. So in the instant case, the fact that the disclosure may be harmful to the alleged client should not operate to extend the client-attorney privilege beyond the scope clearly outlined by its history, its purpose and the principles underlying it. If the contention of the relator should be upheld and disclosure of the alleged client's name prohibited, the injury that would result to the correct and orderly administration of justice would be immeasurably greater than the benefit that would inure to the relation of attorney and client. Notwithstanding its ancient history and general acceptance, " the privilege remains an anomaly. Its benefits are all indirect and speculative; its obstruction is plain and concrete. * * * It is worth preserving for the sake of a general policy; but it is none the less an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." (Wigm. Ev. § 2291.)

" This rule of privilege, having a tendency to prevent the full disclosure of the truth, ought to be construed strictly." (SHAW, Ch. J., in *Foster* v. *Hall*, 12 Pick. 89, 98; see, also, BEST, Ch. J., in *Broad* v. *Pitt*, 1 Moody & Malkin, 233.)

The commitment should be sustained on another ground. " The recognition of a privilege," said Mr. Justice CARDOZO in a recent case, " does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy. It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each." (*Clark* v. *United States*, 289 U. S. 1, 13.)

So it has been held that the protection which the law throws around confidences of attorney and client has reference to those which are legitimately and properly within the scope of a lawful employment. It does not put the seal of secrecy on communications made as an aid to the accomplishment of an unlawful purpose. (*Standard Fire Ins. Co.* v. *Smithhart*, 183 Ky. 679; Chamberlayne Ev. § 3692.)

" The privilege," it has been aptly said, " takes as its postulate a genuine relation, honestly created and honestly maintained." (*Clark* v. *United States, supra.*)

A client who consults an attorney for assistance in connection with a contemplated violation of law can expect no help from the law. He cannot complain if the truth is allowed to be told. A mere charge of wrongdoing will not suffice. There must be " something to give colour to the charge; " there must be " *prima facie* evidence that it has some foundation in fact." (*O'Rourke* v. *Darbishire*, L. R. [1920] A. C. 581.)

" Nor does the loss of the privilege depend upon the showing of a conspiracy, upon proof that client and attorney are involved in equal guilt. The attorney may be innocent, and still the guilty client must let the truth come out." (*Clark* v. *United States, supra,* 15, and cases there cited.)

What has taken place here, as indicated by the testimony given before the grand jury on which the commitment was based, certainly lends color to the charge that the relator was retained in furtherance of an unlawful scheme for wholesale violations of the law. That the relator himself may have been in ignorance of this unlawful purpose, and the dupe of his employer, is certainly no reason for refusing to break the seal of secrecy. The privilege vanishes when the relation giving rise to it is abused by the client.

The conclusion reached would seem to be inevitable, if we are to maintain the honor of the profession, and make an officer of the court an agency to advance the ends of justice, rather than to be used as an instrument to subvert them. The identity of an employer or client who retains a lawyer to act for him or for others in a civil or criminal proceeding should not be veiled in mystery. The dangers of disclosure are shadowy and remote; the evils of concealment are patent and overwhelming. As between the two social policies competing for supremacy, the choice is clear. Disclosure should be made if we are to maintain confidence in the bar and in the administration of justice.

The writ is dismissed and the relator remanded to the county jail. Five days' stay will be allowed to enable the relator to determine whether he will purge himself of his contempt or proceed further.