IN THE MATTER OF HERSCHEL KOZLOV, ESQUIRE, CHARGED WITH CONTEMPT OF COURT.

Argued November 13, 1978—Decided February 28, 1979.

*Mr. Joseph H. Kenney* argued the cause for appellant (*Messrs. Archer, Greiner & Read,* attorneys; *Mr. Charles L. Harp, Jr.,* on the brief).

*Mr. Peter H. Brennan,* Deputy Attorney General, argued the cause for respondent (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

HUGHES, C. J. The factual background of the judgment from which this appeal is taken is generally well stated in the opinion of the Appellate Division. *In re Kozlov,* 156 *N. J. Super.* 316 (App. Div. 1978). It is unnecessary for us to consider all of the legal conclusions it reached on that factual base, since we are convinced that its judgment must be reversed on an entirely separate and supervening ground — one not prominently dealt with therein, and perhaps not sufficiently recommended to its attention by the parties or indeed by the factual record made in the case. Be that as it may, the following somewhat unusual question is projected by this appeal.

One Floard C. Catlett, the police chief of the Borough of Lawnside in Camden 'County, was convicted by a jury on an indictment charging him with a criminal offense, the nature of which is not relevant to the issue before this Court. A member of that jury, one Yacovelli, Juror Number 11, had denied by his silence on *voir dire* examination by the court under *R.* 1:8–3, that he knew the trial defendant or was

prejudiced against him in any way. Indeed he forswore by that very silence that *any* matter existed which might affect his service as an impartial and disinterested juror. As a natural result the trial defendant interposed no challenge to such juror, either for cause, *R.* 1:8–3(b), or peremptorily, *R.* 1:8–3(d), and thus it came about that Yacovelli sat in judgment on defendant.

Some time after the highly publicized conviction of Catlett events occurred which led eventually to the conviction for contempt, by the Catlett trial judge, of an attorney at law, the appellant-respondent Kozlov, described below as a "reputable member of the bar acting in good faith * * *." *In re Kozlov, supra,* 156 *N. J. Super.* at 320. Kozlov had theretofore been uninvolved in any way with the Catlett trial itself, and might well be characterized as the classic "innocent bystander." The events which led to his conviction, described in proceedings preliminarily (and appropriately) heard *in camera, Scott v. Salem Cty. Memorial Hosp.,* 116 *N. J. Super.* 29, 35 (App. Div. 1971), came about in this way. A long-standing family and business client of Attorney Kozlov, while consulting him on an unconnected legal matter, solicited professional advice as to his, the client's, duty to divulge knowledge which had come to him accidentally and which affected the validity of the Catlett conviction and thus the integrity of the administration of justice. The evidence supplied to Kozlov, if true, would have so contaminated the jury conviction of Catlett as to despoil his Sixth Amendment right to fair trial by an impartial jury and to entitle him, under most conceivable circumstances, to new trial.

The information was related to Kozlov by his client on condition that whatever the lawyer decided to do with it, the client's name as its source would never be revealed. Compatible, surely, with his obligation as an officer of the court, Kozlov disclosed the information to one Poplar, defense attorney for Catlett, emphasizing the stipulated anonymity of his client. While he might better have directly informed the

trial court (DR 7–108(E) provides: "A lawyer shall reveal promptly to the court improper conduct by * * * a juror * * * of which the lawyer has knowledge"), we regard this misdirection as inconsequential in the circumstances. Kozlov was entitled to assume that Poplar would transmit the information to the court in support of a challenge to the validity of the Catlett verdict. Indeed, had Kozlov alternatively decided to inform the prosecutor, that official would have been equally bound to share the information with the court and for the same purpose — to elicit its inquiry and impartial judgment as to the validity of the basic conviction. *See State v. Vinegra*, 73 *N. J.* 484, 501–02 (1977).

The information involved was as follows: shortly after Catlett's conviction, juror Yacovelli was heard to boast that he had gotten "even with the defendant [Catlett] for the arrest and prosecution of a member of his [Yacovelli's] family." *In re Kozlov, supra*, 156 *N. J. Super.* at 318. As we have indicated, this activated Kozlov's professional conscience and action. Understandably, his disclosure induced this movement by Poplar:

Poplar investigated Kozlov's information and discovered that a person bearing the same surname as the juror in question and residing at his address had in fact been the defendant in a disorderly person's proceeding in the Borough of Lawnside Municipal Court. He thereupon made application pursuant to *R.* 1:16–1 to the judge who had presided at Catlett's trial seeking to have the juror interviewed. The application was supported by Poplar's affidavit which contained Kozlov's hearsay, a recitation of the pertinent facts of the Lawnside Municipal Court proceeding and the recollection that at the *voir dire* of prospective jurors the juror in question, as did all the others ultimately sworn, denied knowing Catlett or having any reason for bias against him. [*Id.* at 319 (footnote omitted)].

We observe that Poplar could probably have gone no further in his investigation under the stricture of *R.* 1:16–1,[1]

---

[1] *R.* 1:16–1 provides:

Except by leave of court granted upon good cause shown, no attorney or party shall himself or through any investigator or

*State v. LaFera*, 42 *N. J.* 97, 105–07 (1964), so that under that rule he appropriately appealed to the court to initiate and supervise further investigation including, certainly, interrogation of the juror.

The Appellate Division recalled that the "trial judge was not satisfied with the sufficiency of Poplar's affidavit as a basis for initiating the juror-interrogation process since the affidavit relied exclusively on the hearsay information and the municipal court record, which on its face showed no direct link between the juror and Catlett." 156 *N. J. Super.* at 319 (footnote omitted). As the more certain record stands before us now, however, the "no direct link" postulate of that decision is significantly weakened. For by leave of this Court the record has been amplified by copies of the municipal court arrest report of one Luciana Yacovelli, which evidences a much stronger link between the juror and Catlett. This evidence was not, as it should have been, fully placed before the trial judge, although its existence was suggested on the record. That faulty record no doubt misled both trial judge and Appellate Division.

It is now clear that the arresting officers were, in fact, Patrolman James Morris and Sergeant Floard C. Catlett, Jr. (defendant Catlett's son). They acted on a charge of violation of *N. J. S. A.* 2A:170–98 (shoplifting) and *N. J. S. A.* 2A:170–29 (use of offensive language, etc.). Luciana Yacovelli was convicted in the municipal court on the first charge mentioned. This link seems to us to be circumstantially so persuasive that it, had it been entirely made clear, together with the hearsay evidence of juror Yacovelli's boast of retaliation against Catlett for a supposed wrong, should have energized the trial judge to proceed with an immediate investigation, commencing with his interrogation of Luciana Yacovelli and the juror involved, to determine their rela-

---

other person acting for him interview, examine or question any grand or petit juror with respect to the verdict or deliberations of the jury in any action.

tionship and the supposed rancor and prejudice attributed to the juror because of her conviction. *Cf. Scott v. Salem Cty. Memorial Hosp., supra,* 116 *N. J. Super.* at 37 ("In light of the evidence to which we have alluded * * * we are convinced that the trial court should have allowed further inquiry with respect to the alleged irregularit[y])."

Instead there ensued a sequence of *in camera* hearings, to interrogate not the implicated juror but rather the attorney who had reported the alleged misconduct. These hearings explored at considerable length the scope of the attorney-client privilege, and the nuances of distinction between the forced disclosure of a professional communication itself and the identity of the client. *In re Richardson,* 31 *N. J.* 391, 397 (1960) ; *State v. Toscano,* 13 *N. J.* 418, 424 (1953) ; *In re Kozlov, supra,* 156 *N. J. Super.* at 321–24. The trial court decided, and the Appellate Division agreed, that the attorney-client privilege did not extend so far as to permit Kozlov to withhold the name of his client, and that he was in contempt of court for so doing. The while, the appeal of Catlett from his conviction has been held pending the outcome of the present case.

We are mindful, and respectful, of the thrust of *R.* 1:16–1 which would inhibit the harassment by disappointed attorneys or parties of jurors, grand or petit, who have acted in fulfillment of the highest public duty (perhaps short of military service or the exercise of the franchise) expected of a citizen. The administration of justice requires that their freedom of action be shielded from such harassment, especially as affecting their decision-making process. *State v. Athorn,* 46 *N. J.* 247, 251–52 (1966) ; *State v. LaFera, supra; O'Regan v. Schermerhorn,* 25 *N. J. Misc.* 1, 31 (Sup. Ct. 1946). As Lord Coke observed of Judges, 12 *Coke Rep.* 23, 25, 77 *Eng. Rep.* 1305, 1307 (S. C. 1608), jurors, because they are involved in the judicial function, need only make account to the King [the State] (such as by accountability for any criminal corruption on their part) and to God for their decision. *See In re Quinlan,* 70 *N. J.* 10, 48 (1976) ;

*State v. Winne,* 21 *N. J. Super.* 180, 210 (Law Div. 1952), *rev'd on other grounds,* 12 *N. J.* 152 (1953). This for the sake of their judicial independence and integrity of action upon which the administration of justice so plainly depends. The "good cause" envisaged by *R.* 1:16–1 is not so much impropriety or defect in the motives or methods or thought processes by which the jurors reach their verdict, *State v. Athorn, supra,* 46 *N. J.* at 251–52, but rather concerns some event *aliunde*—some occurrence injected into the deliberation in which the capacity for prejudice inheres. *State v. Kociolek,* 20 *N. J.* 92, 100 (1955).

Where a juror on *voir dire* fails to disclose potentially prejudicial material, such as that involved in this case, a party may be regarded as having been denied fair trial. This is not necessarily because of any actual or provable prejudice to his case attributable to such juror, but rather because of his loss, by reason of that failure of disclosure, of the opportunity to have excused the juror by appropriate challenge, thus assuring with maximum possible certainty that he be judged fairly by an impartial jury. *State v. Deatore,* 70 *N. J.* 100, 105–06 (1976).

*Deatore* emphasizes the initiative expected of a trial judge to explore and make certain the presence of elements essential to the proper administration of justice, including very importantly the impartial jury basic to that ideal. *Id.; State v. Jackson,* 43 *N. J.* 148, 157 (1964); *Wright v. Bernstein,* 23 *N. J.* 284, 294–95 (1957).

The responsibility of a trial judge, as guardian and exemplar of the pure administration of justice, would require him, while spurning any officious interference with the independence and integrity of the mental processes of a jury (*State v. Athorn, supra,* 46 *N. J.* at 252), to seek out and expose outside factors impinging upon the jury's freedom of action and thus its impartiality and essential integrity. Any matter which would contaminate the latter should invite the aggressive attention and concern of the trial judge for he,

above all others, is the immediate custodian and steward of justice in the circumstances and exigencies of the particular case.

We have the most serious doubt, in the context of the case before us, of the validity of any inflexible thesis that the identity of the client, as distinguished from the substance of his professional confidence, is outside the ancient privilege deemed to exist between attorney and client.[2] We are not dealing here with the identity of the payor of a retainer fee (perhaps only theoretically a "client") for the professional defense of others accused of gambling crimes, as in *State v. Toscano, supra,* and *People ex rel. Vogelstein v. Warden of County Jail,* 150 *Misc.* 714, 270 *N. Y. S.* 362 (Sup. Ct. 1934), *aff'd* 242 *App. Div.* 611, 271 *N. Y. S.* 1059 (App. Div. 1934); or of another accused as a corrupt public servant, as in *In re Richardson, supra;* or of a prostitute in a Mann Act violation case, *United States v. Pape,* 144 *F.* 2d 778 (2d Cir. 1944). The higher public interest and necessity motivating the courts in such cases do not exist here — on the contrary. For if a decent lawyer must choose, by force of law, to protect his professional life by a circumspection which would cause him to suppress information going to the heart

---

[2] The basis of this privilege was well described many years ago in *Hatton v. Robinson,* 31 *Mass.* (14 Pick.) 416, 422 (1833), where Chief Justice Shaw said:

\* \* \* This principle we take to be this; that so numerous and complex are the laws by which the rights and duties of citizens are governed, so important is it that they should be permitted to avail themselves of the superior skill and learning of those who are sanctioned by the law as its ministers and expounders, both in ascertaining their rights in the country, and maintaining them most safely in courts, without publishing those facts, which they have a right to keep secret, but which must be disclosed to a legal adviser and advocate, to enable him successfully to perform the duties of his office, that the law has considered it the wisest policy to encourage and sanction this confidence, by requiring that on such facts the mouth of the attorney shall be forever sealed.

of the administration of justice, the public interest in the probity of justice would be betrayed. So here, if the law would force Kozlov to forget about the information he heard from his client rather than pass it on, not only would the administration of justice be frustrated but Kozlov himself would be in violation of his ethical duty under *DR* 7–108(E).

Proceeding from this paradox, we classify Kozlov's dilemma of professional conscience[3] as being within the attorney-client privilege if only because of the "balancing test" between the public interest in the search for truth and the privilege itself. *See* Note, "The Attorney-Client Privilege: Fixed Rules, Balancing, and Constitutional Entitlement," 91 *Harv. L. Rev.* 464 (1977). As stated for this Court by Justice Jacobs in *In re Richardson, supra,* 31 *N. J.* at 401, "[t]he matter is truly one of balance * * *" as indeed was recognized by the Appellate Division here although it did not think, as we do, that it ran clearly in favor of the privilege asserted by Kozlov. We would identify the particular circumstances here with the case of *In re Kaplan,* 8 *N. Y.* 2d 214, 203 *N. Y. S.* 2d 836, 168 *N. E.* 2d 660 (1960), in which Chief Judge Desmond wrote for the Court of Appeals:

---

[3]There is occasional difficulty in harmonizing the lawyer's ethical responsibility to his client and his duty as an officer of the court. *Cf. Maness v. Meyers,* 419 *U. S.* 449, 95 *S. Ct.* 584, 42 *L. Ed.* 2d 574 (1975) ; *In re Callan,* 66 *N. J.* 401 (1975). Elements important to the resolution of this dilemma include the "integrity of the rule of law," *Callan, supra,* 66 *N. J.* at 407, the constitutional rights of clients, *Maness, supra,* and the professional obligation of the lawyer, which factors sometimes converge to produce "occasions when our system of justice seems to give the nod to the client." *Callan, supra,* 66 *N. J.* at 410, 411. Indeed, the difficulty has been described as a "trilemma" of the conscientious attorney — "that is, the lawyer is required to know everything, to keep it in confidence, and to reveal it to the court." M. Freedman, *Lawyers' Ethics in an Adversary System* 28 (1975). *Cf. Lowery v. Cardwell,* 575 *F.* 2d 727, 730–32 (9th Cir. 1978).

The law question \* \* \* is whether an attorney confidentially retained by a client to pass certain information to a public investigating body is to land in jail because he is willing to disclose the information but not his client's identity. Imposition of a sanction so Draconian and so destructive of the ancient rules as to lawyer-client privilege calls for close security. We do not think it can be held valid.

\* \* \* Usually, it is not the client's name but the client's communication to his lawyer which is held to be sacred, and so, ordinarily, there is no need to conceal the name to preserve the confidence. But here the client's communication had already been divulged to the Commissioner and it was the client's name that deserved and needed protection (see *Elliott v. United States*, 23 *App. D. C.* 456; *United States v. Lee*, C. C., 107 *F.* 702), for fear of reprisals, etc. Since there was no reason to doubt that the informant was a client of appellant, it was unnecessary to investigate that relationship. Since the client's communication to appellant was made in the aid of a public purpose to expose wrongdoing and not, as in the Vogelstein case, to conceal wrongdoing, the seal of secrecy should cover the client's name, so long as his information was made available to the public authorities. The contrary holding serves no right end, contravenes the ancient policy \* \* \* and embarrasses and penalizes a lawyer for taking a course consistent with his professional and civil responsibilities. [8 *N. Y.* 2d at 217–19, 203 *N. Y. S.* 2d at 838–839, 168 N. E. 2d at 661].

None of this is to say that the privilege, while exceedingly important, is sacrosanct. The Disciplinary Rules themselves recognize exceptions such as a confidential communication leading to the commission of a crime, DR 4–101(C)(3). But here we deal not with a client's confidence given in preparation for the commission of crime but rather its prevention, in the sense of providing information which would, if true, demonstrate a juror's contempt equivalent to a criminal obstruction of justice itself. *See In re Jeck*, 26 *N. J. Super.* 514, 519 (App. Div. 1953).

Therefore if, as we here determine, Kozlov was entitled in the circumstances of this case, to the professional shield of the attorney-client privilege, the path to our decision is made straight and clear. Privilege born of the common law, such as the attorney-client privilege here involved, is not an idle and anachronistic vestige of the ancient past. On the con-

trary, it has a well-defined relationship, recognized and defined over the centuries, to the administration of justice, to the basic needs of the human condition, to the essential rights of man and thus to the public interest. As such it clearly deserves the continued protection of the courts. Considering the respect owed by courts to the legislative will, the same applies to privilege established by statute — such as the so-called "shield" laws protecting those who gather and publish news in the public interest (*N. J. S. A.* 2A:84A–21), or privilege resting on a constitutional base such as the protection of the First Amendment. Yet, as we have indicated, the privilege can fall as in the case of a lawyer-client confidence given for the instigation of crime. Also in the interposition of a supposed First Amendment privilege in the path of a grand jury engaged in the fundamental governmental function of "fair and effective law enforcement * * *." *Branzburg v. Hayes*, 408 *U. S.* 665, 92 *S. Ct.* 2646, 33 *L. Ed.* 2d 626 (1972). Nor does the privilege concept stand even in the case of a constitutionally based President's executive privilege confronting "[t]he * * * integrity of the judicial system * * *," it being thought and ruled by the United States Supreme Court that "[t]o ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." *United States v. Nixon*, 418 *U. S.* 683, 709, 94 *S. Ct.* 3090, 3108, 41 *L. Ed.* 2d 1039, 1064 (1974). *A fortiori* a privilege, even that created by the most precise legislation, did not stand against a defendant's Sixth Amendment right to fair trial, as this Court has recently held in *In re Farber*, 78 *N. J.* 259 (1978), cert. den. *New York Times Co., v. New Jersey*, —— *U. S.* ——, 99 *S. Ct.* 598, 58 *L. Ed.* 2d 670 (1978).

■ But there are necessary foundations to the valid piercing of any such privilege, one of which is absent here. There must be a legitimate need of the party to reach the evidence sought to be shielded. There must be a showing

of relevance and materiality of that evidence to the issue before the court. The record here clearly bespeaks the existence of these necessary elements. But it must also be shown, as pointed out by Justice Mountain for this Court in *Farber, supra,* to the satisfaction of "the trial judge, by a fair preponderance of the evidence including all reasonable inferences, that * * * the information * * * *could not be secured from any less intrusive source.*" *Id* at 276–77 (emphasis supplied).

It is of course obvious that testimony from Luciana Yacovelli and juror Yavocelli would have constituted that less intrusive source, which source should have been explored and exhausted before invoking the drastic contempt remedy here appealed from, no less for the sake of the general administration of justice than for vindication of the alleged contemnor. It is not an inconsequential matter to brand a reputable attorney as contemptuous of the court of which he is an officer. The trial court action here, probably predicated upon a deficient record and responsive as well to a judicial reluctance to probe, on partially hearsay evidence, the integrity of a jury verdict, yet was error in its omission to confront this juror (after ascertaining the relationship of Luciana Yacovelli and the probable bearing of her conviction on his motives) at least with the question of his alleged duplicity, that it might be admitted or disproved. To hold that Attorney Kozlov contemned the court while this "less intrusive source" of information was available was, we think, error of such nature that the judgment of contempt must be set aside, and the cause remanded to the Law Division for appropriate proceedings not inconsistent with this opinion.

In view of the somewhat convoluted procedural status here (*State v. Catlett* on appeal and thus within the jurisdiction of the Appellate Division, *R.* 2:9–1(a); *In re Kozlov,* remanded, and so within the jurisdictional competence of the Law Division) we suggest the course that such additional proceedings should follow. This for the sake of clarity, to

avoid circuity of action and to serve efficiently the ends of justice, inasmuch as these two litigations are inevitably intertwined.

The Appellate Division, on the appeal of *State v. Catlett,* should remand to the trial court the issue concerning the motion for a new trial based on the question of juror integrity. That being done, the trial court should proceed expeditiously with the inquiry we have recommended, that is to say the establishment of the facts by interrogation of the Yacovellis. Should that be abortive and if any other possible "less intrusive source" repositories of evidence are exhausted, it may again become necessary to press Attorney Kozlov and the case as to him may be reactivated. On the other hand, if the inquiry by the trial court discloses substance to the charge of bias on the part of juror Yacovelli, it would seem right and just that the trial court consider such new evidence as bearing upon the validity of the Catlett conviction.

Having made its determination as to new trial, the trial court will report same to the Appellate Division in amplification of the record before it, so that the latter may proceed to consideration of the whole matter tendered for its decision.

We note an additional word of caution. It is occasionally advisable, particularly where a decision rests upon an opinion seeming to chart a new or controversial doctrinal path in state law, that the limitations thereof be emphasized, as by reference to the relevance of the particular circumstances of the case before the Court. *Cf. American Trial Lawyers v. New Jersey Supreme Court,* 66 *N. J.* 258, 267 (1974). Obviously, as suggested by the learned author of the concurring opinion herein, there may be other less urgent circumstances than at present, such as a case in which the clear necessities of justice, predicated upon the unending search for truth which is the mission of the law, would outweigh the privilege which we uphold here. No one can doubt that reality. We do not intend our opinion to be read

as extending to such questions, whose resolution must await a specific case, upon the appropriate record.

Reversed.

HANDLER, J., concurring. I concur in the result reached by the Court. The Court is eminently correct in emphasizing that the trial judge in this case should have pursued other alternatives in extirpating possible jury taint before resorting to the interrogation of the attorney with his conviction for contempt as the unfortunate sequel. The Court finds in the circumstances of this case a privilege applicable to the identity of the attorney's client. It lays considerable stress upon the strength and pervasiveness of this privilege in adjuring the trial court to pursue "less intrusive" means for ascertaining the truth of the matter. *Ante* at 244; see *In re Farber,* 78 *N. J.* 259, 276–277 (1978), *cert.* den. *New York Times Co. v. New Jersey,* —— *U. S.* ——-——, 99 *S. Ct.* 598, 58 *L. Ed.* 2d 670 (1978). While I agree that the trial court should have explored other, more obvious ways of getting to the root of the controversy, I would not counsel this course of action because of the existence of an attorney-client privilege. Rather, I deem such action to be preferred as a sound and reasonable exercise of discretion.

The majority of the Court seems to say that the attorney-client privilege covers identity wholly apart from communications, relying in part upon the reasoning of *In re Kaplan,* 8 *N. Y.* 2d 214, 203 *N. Y. S.* 2d 836, 168 *N. E.* 2d 660 (1960), *Ante* at 241–243. I have serious reservations as to whether the attorney-client privilege applies to the identity of the client. The privilege emanating from the professional and confidential relationship between an attorney and client has to do with "communications". It does not in terms protect against the revelation of the existence of the relationship or the identity of the parties. As codified in *Evid. R.* 26 and *N. J. S. A.* 2A:84A–20, the traditional attorney-client privilege focuses upon protection of communications, *viz*:

\* \* \* [*C*]*ommunications* between lawyer and his client in the course of that relationship and in professional confidence, are privileged \* \* \*. (Emphasis supplied).

Thus expressed, it may be compared instructively to the informant's privilege which deals explicitly with "identity", *Evid. R.* 36 and *N. J. S. A.* 2A:84A–28, as well as the "shield law" which grants newspapermen a specific privilege of confidentiality with respect to "[t]he source, author, means, agency or person from or through whom any information was procured \* \* \*", *Evid. R.* 27 and *N. J. S. A.* 2A: 84A–21(a).

There has been general recognition in different contexts that the traditional attorney-client privilege does not cloak identity *per se. State v. Toscano,* 13 *N. J.* 418, 424 (1953) noted that "[m]ost of the authorities hold that while the privilege protects against the disclosure of confidential communications from the client to his attorney, it is not intended to permit concealment by the attorney of the identity of his client". See *Behrens v. Hironimus,* 170 *F.* 2d 627 (4 Cir. 1948); *United States v. Pape,* 144 *F.* 2d 778 (2 Cir.), *cert.* den. 323 *U. S.* 752, 65 *S. Ct.* 86, 89 *L. Ed.* 602 (1944); *Tomlinson v. United States,* 68 *App. D. C.* 106, 93 *F.* 2d 652 (D. C. Cir. 1937), *cert.* den. *sub nom. Pratt v. United States,* 303 *U. S.* 642, 58 *S. Ct.* 645, 82 *L. Ed.* 1107 (1938); *People ex rel. Vogelstein v. Warden of County Jail,* 150 *Misc.* 714, 270 *N. Y. S.* 362 (Sup. Ct.), aff'd 242 *App. Div.* 611, 271 *N. Y. S.* 1059 (1934); 8 *Wigmore, Evidence* (McNaughton rev. 1961) § 2313; Annot, "Disclosure of Name, Identity, Address, Occupation, or Business of Client as Violation of Attorney-Client Privilege", 16 *A. L. R.* 3d 1047 (1967). Where identity has been accorded the protections of the attorney-client privilege, it is usually when that identity is interrelated with the communication itself so that the revelation of the party would jeopardize the confidentiality of the underlying communication. 156 *N. J. Super.* 316, 322–323 (App. Div. 1978), citing as illustrative cases, *N. L. R. B. v. Harvey,* 349 *F.* 2d 900 (4 Cir.

1965) ; *Baird v. Koerner,* 279 *F.* 2d 623 (9 Cir. 1960) ; *In re Kaplan, supra.* It can hardly be claimed in this case, however, that, the communication having been divulged, there is any lingering need to preserve the anonymity of its author.

In addition, doubts as to the breadth of the attorney-client privilege ought to be settled by narrowing, rather than widening, its scope. It has been reiterated in many cases that privileges interfere with the search for truth and should be construed restrictively. *E. g., State v. Jamison,* 64 *N. J.* 363, 375 (1974) ; *State v. Briley,* 53 *N. J.* 498, 506 (1969) ; *In re Selser,* 15 *N. J.* 393, 405–407 (1954) ; also, *In re Farber, supra,* 78 *N. J.* at 295, 301 (Handler, J., dissenting). The matter was aptly expressed in *In re Richardson,* 31 *N. J.* 391, 396 (1960) :

> Since the privilege results in the exclusion of evidence it runs counter to the widely held view "that the fullest disclosure of the facts will best lead to the truth and ultimately to the triumph of justice." See *In re Selser,* 15 *N. J.* 393, 405 (1954).

This healthy policy does not justify an expansive construction of the attorney-client privilege to encompass not only confidential communications as such but the identity of the parties to such communications.

While there is no legal impediment grounded upon a privilege which would prevent the disclosure of the client's identity, it does not follow that such disclosure would come about in every case as a matter of course. It would be wrong to assume that the revelation of a party's identity, even in the absence of a privilege, would be automatic regardless of circumstances. Whether disclosure occurs must be addressed to the sound discretion of the trial judge. As with all demands for the production of evidence or for discovery to find evidence, the court must weigh the need for such evidence or discovery with the countervailing concerns of individuals resisting such demands. It must determine under the circumstances of the particular controversy whether such

resistance is reasonable and whether safeguards should be erected to protect against unnecessary harassment, unfairness, or oppression. Consider generally, *Evid. R.* 4 and *R.* 4:10–3 as well as *State v. Mingo,* 77 *N. J.* 576 (1978); *Schlossberg v. Jersey City Sewerage Authority,* 15 *N. J.* 360 (1954); *State v. Cooper,* 2 *N. J.* 540 (1949); *Wasserstein v. Swern and Co.,* 84 *N. J. Super.* 1 (App. Div. 1964).

At this juncture in the present case, it would appear entirely reasonable to require the pursuit of evidence of jury impropriety through alternative means other than compelling disclosure of the client's identity. The Court's opinion explains the reasons for this choice, *Ante* at 235–236 and even though couched in the terminology of privilege, they nevertheless reflect salutary considerations which should guide a court in the exercise of a sound discretion. In the event there is a continued demand to reveal the client even after the production of other evidence, the trial court should then balance the impact and the intrusiveness upon the client-witness of requiring such disclosure with the adequacy of the available evidence in terms of arriving at the truth. Although a witness' sincere desire for anonymity to avoid personal embarrassment, inconvenience and the like does not in a criminal case weigh as heavily as it might in a civil case, it should nonetheless invite conscientious consideration by the court. The court should look down the road and, if possible, avoid following the route leading to contempt. *Cf. In re Contempt of Carton,* 48 *N. J.* 9 (1966). Moreover, while the client's wish for anonymity may not count for much against the needs of a defendant or the State in the context of criminal proceedings, such anxieties may be entitled to greater solicitude in civil controversies involving only private litigants. While the search for truth is always a paramount value, the struggle between contending private interests in a civil action, whether involving a privilege or not, is more evenly balanced.

The Court, in holding that there is in the circumstances of this case an attorney-client privilege which serves to secrete

the client's identity, as well as his communications, emphasizes that the privilege, if invoked in later proceedings, might well have to yield to the importunities of the criminal justice system, *e. g., Branzburg v. Hayes,* 408 *U. S.* 665, 92 *S. Ct.* 2646, 33 *L. Ed.* 2d 626 (1972), and a criminal defendant's constitutional claims for a trial at the hands of a fair and impartial jury, *cf. In re Farber, supra.* The Court is correct in pointing out that the privilege is less than absolute and the values which it seeks to protect would give way in a collision with those which inhere in the constitutional and fair administration of criminal justice. In that context, a client's fear of embarrassment and the possible quenching of useful, though anonymous, information relevant to the cause of law enforcement would not surmount the need to disclose his identity where he is shown to be an important witness. Believing as I do, however, that identity is not shrouded by any privilege, I would have even less difficulty in determining how the balance should be struck between the conflicting interests of the client-witness and those of the defendant and the State in a criminal proceeding.

For these reasons, I concur separately in the disposition of the Court.

HANDLER, J., concurring in the result.

*For reversal and remandment*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For affirmance*—None.