OPINION OF THE COURT
Joseph E. Fahey, J.
*399 The People seek an order compelling the respondent, an attorney duly licensed to practice law in New York, to answer certain questions before a Grand Jury concerning the whereabouts of a client who is the target of the Grand Jury concerning charges of custodial interference in the first degree in violation of section 135.50 of the Penal Law, a class E felony, along with lesser oifenses.
On or about July 31, 1995, the target of the investigation who was embroiled in an ongoing matrimonial action allegedly left the State taking the couple’s seven-year-old son. At the time the mother and child disappeared, the couple apparently had a temporary order awarding them joint custody. On July 30, 1995, the husband had filed a complaint charging her with criminal contempt in the second degree in violation of section 215.50 of the Penal Law, a class A misdemeanor, in the Town of Clay Court for allegedly failing to return the child to him following visitation. Her whereabouts and the child’s remain unknown.
On April 7, 1997, the Onondaga County Sheriffs Department filed a complaint charging her with custodial interference in the first degree in violation of section 135.50 of the Penal Law and Federal law enforcement authorities issued a warrant for unlawful flight to avoid prosecution in violation of 18 USC § 1073 on April 17, 1997.
On November 25, 1997, the respondent was subpoenaed before the Onondaga County Grand Jury and questioned about his client without having had to waive immunity from prosecution.
During the course of that appearance, he related that he had represented his client in her matrimonial proceeding during the summer of 1993 until early June 1994 when he discontinued representing her. He resumed representing her in March 1995 and was her attorney of record in those proceedings on the date she and the child left the area. On August 2, 1995, he applied to New York State Supreme Court to be relieved as her attorney in the matrimonial action. The application was not approved until September 22, 1995. Following her departure on July 31, 1995 and before the order relieving him of further representation on September 22, 1995, the respondent was contacted by his client to discuss the possible charges of custodial interference that could be filed because of her flight. The respondent fixed the time of this initial contact at the end of August 1995. The respondent has apparently had multiple contacts with her between September 22, 1995 and November *400 25, 1997, the date of his appearance before the Grand Jury, at least one of which was a personal meeting with her.
On October 31, 1997, the respondent and his attorney met with State and Federal law enforcement officials at the United States Attorney’s office in Syracuse, New York, to attempt to reach a negotiated global resolution of her charges should she voluntarily return. At that meeting, the respondent apparently informed authorities he was optimistic a resolution could be achieved and that he would need several days to contact her and agreed to contact them again on November 7, 1997. The respondent testified he attempted to make contact with his client during that period to communicate the proposed resolution to her but was unsuccessful. He further related that on the date of his appearance before the Grand Jury, November 25, 1997, he did not know her or the child’s whereabouts. He testified that from his contacts with her, he believed the child was in good health but declined to answer whether the child was in school asserting that information would be privileged. He likewise testified that he did not disclose nor discuss his contacts with her with her family and did not know if they knew her whereabouts.
In response to all inquiries about how she contacted him, where he met with her, the number of times she contacted him, how he contacted her, the manner in which he sought to communicate the October 31, 1997 proposal to her, her addresses between October 31, 1997 and November 7, 1997, the method by which he communicated with her prior to the October 31, 1997 meeting with State and Federal law enforcement officials, when he last contacted her, if he knows how to contact her, whether he disclosed to her that criminal charges had been filed and warrants issued for her arrest and how the Grand Jury could contact her, the respondent asserted the information was protected by the attorney-client privilege covered in CPLR 4503. The People contend this information is not privileged and seek an order of this court compelling the respondent to respond to the inquiries.
CPLR 4503 provides, in pertinent part: “(a) Confidential communication privileged; nonjudicial proceedings. Unless the client waives the privilege, an attorney or his employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to dis *401 close such communication, in any action, disciplinary trial or hearing, or administrative action, proceeding or hearing conducted by or on behalf of any state, municipal or local governmental agency or by the legislature or any committee or body thereof. Evidence of any such communication obtained by any such person, and evidence resulting therefrom, shall not be disclosed by any state, municipal or local governmental agency or by the legislature or any committee or body thereof.”
Legal analysis of this section and what matters are protected by the privilege have, throughout the years, proven to be a fertile ground indeed. In earlier years, during less complicated times, the attorney-client privilege was absolute (see, Britton v Lorenz, 45 NY 51 [1871]). Of late, however, there has been some erosion of this principle when courts have found public policy considerations should override it.
Both parties, in the case at bar, acknowledge that the factors essential to an analysis of whether information is privileged from disclosure because it is governed by the attorney-client privilege are set forth in Matter of Priest v Hennessy (51 NY2d 62), which this court is intimately familiar with. In that case, the Court of Appeals held that the identity of a client and the terms of fee arrangements were not matters which were privileged and further enunciated a four-part test under which claims of privilege would be determined. There, the Court held: “First, it is beyond dispute that no attorney-client privilege arises unless an attorney-client relationship has been established. Such a relationship arises only when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services. (CPLR 4503, subd [a]; see, e.g., People v Belge, 59 AD2d 307, 309; United States v United Shoe Mach. Corp., 89 F Supp 357, 358-359, supra; 8 Wigmore, § 2992.) Second, not all communications to an attorney are privileged. In order to make a valid claim of privilege, it must be shown that the information sought to be protected from disclosure was a ‘confidential communication’ made to the attorney for the purpose of obtaining legal advice or services. (Matter of Jacqueline F., 47 NY2d 215, 219, supra; People ex rel. Vogelstein v Warden of County Jail of County of N. Y., 150 Misc 714, 717-718; 8 Wigmore, § 2292.) Third, the burden of proving each element of the privilege rests upon the party asserting it. (Matter of Gavin, 39 AD2d 626, 628; Matter of Grand Jury Empanelled Feb. 14, 1978, 603 F2d 469, 474.) Finally, even where the technical requirements of the privilege are satisfied, it may, nonetheless, yield in a proper case, where strong public *402 policy requires disclosure. (Matter of Jacqueline F., 47 NY2d 215, supra; People ex rel. Vogelstein v Warden of County Jail of County of N. Y., 150 Misc 714, supra.)” (51 NY2d 62, 68-69.)
In considering these factors in the instant case, it is readily apparent that the respondent has borne the burden of establishing that there is an attorney-client relationship.[1]
The respondent testified that he represented the mother during a matrimonial action during two separate and distinct time periods and on the date she disappeared with the child. Moreover, the custodial interference investigation being conducted by the Grand Jury grows out of her alleged violation of a temporary order granting joint custody to her and the child’s father during the pendency of that action. It is further clear from the record that the communications being sought by the People began during a period when the respondent was still the attorney of record in the matrimonial action. While the respondent did not know of his client’s impending flight prior to July 31, 1995, it is not surprising that it was he she sought advice from concerning the potential legal consequences of her ill-advised actions.
It is likewise equally apparent that information concerning her whereabouts was imparted to the respondent and intended to be a confidential communication made to him for the purpose of obtaining legal advice or services. The respondent not only testified that he provided advice to her about the criminal charges, including custodial interference in the first degree filed against her, but further attempted to reach a global negotiated disposition of the State and Federal charges pending against her as late as October 31, 1997. The court believes that implicit in the agreed-upon seven-day hiatus between the October 31, 1997 meeting and the date the respondent would report back is an acknowledgement by the authorities that the information concerning the client’s whereabouts had been communicated to him confidentially and the need for him to have sufficient time to communicate with her privately. Moreover, he did not discuss her whereabouts with her family, presumably, because he considered it confidential.
In light of the foregoing determination, it is necessary to further determine whether public policy considerations require the attorney-client privilege to yield to the Grand Jury’s need for this information.
*403 The United States Supreme Court in United States v Nixon (418 US 683 [1974]) reaffirmed that the Fifth Amendment privilege against self-incrimination, and the attorney-client privilege exist on a more exalted plane than a claim of executive privilege by the President of the United States. Justice Burger, writing for a unanimous Bench, noted: “The privileges referred to by the Court are designed to protect weighty and legitimate competing interests. Thus, the Fifth Amendment to the Constitution provides that no man ‘shall be compelled in any criminal case to be a witness against himself.’ And, generally, an attorney or a priest may not be required to disclose what has been revealed in professional confidence. These and other interests are recognized in law by privilege against forced disclosure, established in the Constitution, by statute, or at common law. Whatever their origins, these exceptions * * * are not lightly created nor expansively construed, for they are in derogation of the search for truth.” (418 US 683, 709-710.)
In New York, the Court of Appeals has carved out some limited exceptions to the privilege. As noted earlier, it has held that the identity of a client and fee arrangements are not privileged (Matter of Priest v Hennessy, supra). Likewise, in Matter of Jacqueline F. (47 NY2d 215, supra), which the People urge is dispositive of their application, the Court ordered disclosure of a client’s address where the client had fled to Puerto Rico after litigating and losing a custody proceeding. While, at first blush, Jacqueline F. (supra) might seem controlling, upon closer analysis, it did not implicate some of the considerations present here.
At the outset, it is significant to consider that the disclosure compelled by the Court of Appeals in Matter of Jacqueline F. (supra) occurred in the context of a civil proceeding rather than a criminal one. As such, disclosure was not in derogation of the client’s Fifth Amendment privilege against self-incrimination or Sixth Amendment right to the effective assistance of counsel, which gives greater vitality to the attorney-client privilege. Indeed, the Court of Appeals may well have contemplated that a blanket rule ordering disclosure of a client’s whereabouts in all instances is neither desirable nor appropriate when it held:
“In the determination whether a communication by a client to an attorney should be afforded the cloak of privilege, ‘ “much ought to depend on the circumstances of each case” ’. (Matter of Kaplan [Blumenfeld], 8 NY2d 214, 219, supra, quoting 8 Wigmore, Evidence [5th ed], § 2313, p 609.) * * *
*404 “Of course to be distinguished from the present case are those situations in which a communication by a client to an attorney is made with the expectation that this information will be kept confidential for a legitimate purpose.” (47 NY2d 215, 222, supra.)
This is not to say that courts have not ordered the disclosure of a client’s location in criminal proceedings. In Matter of Doe (101 Misc 2d 388 [Sup Ct, NY County 1979]), the court ordered an attorney to disclose the address of a client who had breached the conditions of a plea agreement by not obtaining mental health counseling. Disclosure in this instance neither strengthened the prosecution case nor undermined the defense.
That decision was relied upon in Matter of Grand Jury of County of Suffolk (117 Misc 2d 197 [Suffolk County Ct]), where the court ordered an attorney to disclose the whereabouts of his client who had jumped bail five years previously and was being indicted for bail jumping in violation of section 215.56 of the Penal Law.
In directing the attorney to disclose his client’s location, Judge Namm, justifying his action upon the premise that the offense was a “continuing crime”, wrote: “While no one herein has accused counsel of aiding his client in the commission of a crime, the crime of bail jumping, by its very nature, is a continuing crime, and continues until after the fugitive has been apprehended, or adequate legal excuse has been provided for his absence. Therefore, it can be said that counsel has cloaked himself with the attorney-client shield * * * where both the law and ethics dictate that such shield not be invoked, and that the attorney divulge such information to the proper authorities, namely, the Grand Jury of Suffolk County.” (Citations omitted.) (117 Misc 2d 197, 201, supra.)
Moreover, in addressing the subject of the attorney-client privilege, the court went on to observe: “Here as there [Matter of Doe, supra], the invocation of the attorney-client privilege thwarts the lawful purpose of the Grand Jury, and for this court to permit same would be to encourage activity which would aid and abet the advancement of an unlawful act. While counsel’s consideration of the interests of his client are much to be admired in the abstract the same must give way to the public interest in the investigation of a continuing crime” (supra, at 202).
*405 The People, in this case, contend that the offense which is under investigation is also a continuing crime[2] which requires the respondent to disclose the last known addresses of his client. This court, however, has found no authority which abrogates the attorney-client privilege where the People contend that crime is a “continuing one”. To adopt this reasoning would mean that each time a person is under investigation for what is claimed to be a “continuing” crime and it is believed the attorney possesses information which could inculpate the client, “the public interest” would require him to testify against the client thereby converting the attorney into a witness against the client. Needless to say, such a result would soon erode all of the salutary protections which the attorney-client privilege was designed to foster.
Moreover, the information being sought here is substantially different than that compelled in Matter of Jacqueline F. (supra), Matter of Doe (supra), and Matter of Grand Jury of County of Suffolk (supra).
As noted above, the information compelled in Matter of Jacqueline F. (supra) was in a civil proceeding in which enforcement of a custody order was being sought. In Matter of Doe (supra) the client’s whereabouts were being sought because she had breached a plea agreement. In Matter of Grand Jury of Suffolk County (supra) information concerning the client’s whereabouts was compelled for purposes of apprehending the client. While the information being sought in the instant case could likely lead to the client’s apprehension also, more is being sought. The testimony sought to be compelled from respondent here would provide a critical, essential element of the felony of custodial interference in the first degree in violation of section 135.50 of the Penal Law, i.e., that the client removed the child from the State. Unlike the crime of bail jumping in Matter of Grand Jury of County of Suffolk (supra), which was completed when the accused failed to appear as required, the respondent is being asked to provide evidence against his client which is the very gravamen of the offense to be charged.
*406 In People v Beige (83 Misc 2d 186 [Onondaga County Ct], affd 50 AD2d 1088, affd 41 NY2d 60, supra), a Judge of this court dismissed an indictment against an attorney charging him with violating the Public Health Law by not reporting he had uncovered the remains of a young woman which had been disclosed to him by his client who was being prosecuted for murder. Judge Gale recognized that disclosure of this evidence would have provided an essential link in the chain of evidence which would have resulted in the client being charged with the victim’s murder. Passing upon the importance of the attorney-client privilege, Judge Gale wrote: “the Constitution of the United States of America attempts to preserve the dignity of the individual and to do that guarantees him the services of an attorney who will bring to the Bar and to the Bench every conceivable protection from the inroads of the State against such rights as are vested in the Constitution for one accused of a crime. Among those substantial constitutional rights is that a defendant does not have to incriminate himself. His attorneys were bound to uphold that concept and maintain what has been called a sacred trust of confidentiality.” (People v Beige, 83 Misc 2d 186, 190.)
No less a result is required here. While the apprehension of the client may be desirable in order to bring closure to this situation, the price of exacting it at the expense of the attorney-client privilege is simply too high.
Finally, although not specifically addressed in their application, the court notes that the respondent was questioned about information other members of his client’s family might have concerning her whereabouts. It, therefore, appears to the court that there may be alternative, less intrusive sources for the information sought which are yet unexplored. To that extent, Judge Fuchsberg’s admonition in Matter of Priest v Hennessy (51 NY2d 62, 73, supra) is worth recalling: “Moreover, the prosecution is not entitled to pierce the privilege simply because it is an easier means of obtaining information diligent investigation would nonetheless turn up. This is especially true where the confidential representation could provide a vital link in the chain leading to conviction (see Baird v Koerner, 279 F2d 623; see, also, Matter of Kaplan [Blumenfeld], 8 NY2d 214). There is little doubt here that this identifying information was precisely the goal of the District Attorney in seeking to pry into matters as to which he already had significant independent evidence. ‘That [the privilege’s] enforcement at times may frustrate the administration of justice will not suffice alone *407 to allow for its breach; indeed, its very purpose may be to keep secure the imparting of information which the State would, if known to, use to its advantage’ (Matter of Jacqueline F., 47 NY2d 215, 226 [my dissent]).”
For all of the foregoing reasons, the People’s application to compel the respondent to answer further questions before the Grand Jury is denied.

. The court finds that the allegation that the respondent may have had a “personal” relationship with the client to be of little moment.

. This court takes issue with either crime being characterized as a continuing one. The crime of bail jumping set forth in article 215 of the Penal Law is complete on the date the absconder fails to appear as required. Likewise, the crime of custodial interference in the first degree contained in section 135.50 of the Penal Law is complete on the date the accused removes the child from the State. While the exact date this occurs, in some cases, may be unknown and the conduct may be ongoing, the crime itself is no less complete or incapable of being charged.