**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3820-14T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

W.J.S.,

    Defendant-Appellant.

_____

Submitted March 22, 2017 — Decided  July 26, 2017

Before Judges Alvarez and Lisa.

On appeal from Superior Court of New Jersey,
Law Division, Bergen County, Indictment No.
12-07-1113.

Joseph E. Krakora, Public Defender, attorney
for appellant (Jason A. Coe, Assistant Deputy
Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Bergen County Prosecutor,
attorney for respondent (Catherine A. Foddai,
Senior Assistant Prosecutor, of counsel and
on the brief).

PER CURIAM

Tried to a jury, defendant was convicted of all three counts of the indictment: (1) second-degree sexual assault, N.J.S.A. 2C:14-2c(4); (2) fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3b; and (3) third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4a. Count 2 was merged with Count 1, on which defendant was sentenced to seven-years' imprisonment; on Count 3, defendant was sentenced to a concurrent four-year term.

After the verdict was rendered, but prior to sentencing, a juror came forward with information that another juror disclosed to all of the other jurors during deliberations that she had been the victim of a sexual assault as a young child. This juror described some of the details of the assault to the other jurors in an apparent effort to persuade some of them to find defendant guilty. The juror had not disclosed this prior experience during the jury selection process.

Defendant moved for a new trial. The court conducted individual interviews of each of the twelve jurors. The court rendered a decision, in which it concluded that none of the jurors were affected by this information and that all twelve jurors, including the one who had the prior experience, decided the case based solely on the evidence presented at trial. The court therefore denied defendant's motion and proceeded to sentencing.

The defense moved for a stay of the sentence and for bail pending appeal. The court found that "the case involves a substantial question that should be determined by the appellate court," see R. 2:9-4, and granted the motion. In doing so, the court also found that the other two criteria of Rule 2:9-4 were satisfied, namely that the safety of the community would not be seriously threatened, and defendant was not a flight risk.

Defendant presents the following arguments on appeal:

POINT I

PRECLUDING THE DEFENSE FROM INTRODUCING A VIDEO RECORDING OF BARRY [D'S] PRIOR STATEMENT TO DEMONSTRATE THE MARKED DIFFERENCE IN HIS DEMEANOR ON THE WITNESS STAND WAS REVERSIBLE ERROR.

POINT II

THE PROSECUTOR'S REPEATED QUESTIONS ABOUT DEFENDANT'S SILENCE AT THE TIME OF HIS ARREST, AND HER LATER REFERENCES TO THE SAME DURING CLOSING ARGUMENTS, VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO REMAIN SILENT. (not raised below)

POINT III

THE PROSECUTOR'S EMPHASIS ON THE IMPACT OF THE ALLEGED ASSAULT ON THE VICTIM AND HIS FAMILY, AS WELL AS THE PROSECUTOR'S URGING THE JURY TO CONVICT IN ORDER TO SEND A MESSAGE, CONSTITUTED PREJUDICIAL MISCONDUCT REQUIRING REVERSAL. (not raised below)

POINT IV

REVERSAL IS REQUIRED BECAUSE JUROR NO. 4
FAILED TO DISCLOSE DURING VOIR DIRE THAT SHE
WAS HERSELF A VICTIM OF A SEXUAL ASSAULT AT
THE HANDS OF A FAMILY MEMBER, AS WELL AS THE
FACT THAT SHE USED THAT EXPERIENCE DURING
DELIBERATIONS TO ATTEMPT TO SWAY HER FELLOW
JURORS TO FIND THE DEFENDANT GUILTY.

The arguments contained in Points I through III are unpersuasive and do not provide a basis for reversal. However, we agree with defendant's argument in Point IV and we reverse.

I.

The victim in this case, Julian D.,[1] was born on June 22, 1995. Defendant was born on September 8, 1980, and was therefore fifteen years older than Julian.

All three counts of the indictment arose out of a single incident that occurred sometime in June 2010, when Julian was, or was about to be, fifteen years old, and defendant was three months shy of thirty years old. Defendant and the victim are not related to each other, but there was a long history of a close connection between Julian's family and defendant and defendant's brother, A.S.

---

[1] To preserve confidentiality, our references in this opinion to Julian and his family are pseudonyms, the same ones utilized by the parties in their appellate briefs.

A-3820-14T2

Julian's mother, Denise D., had a long and successful career in the field of music, as a vocalist, producer, songwriter, and vocal instructor. Julian's father, Barry D., was a very successful self-employed financial consultant. In 1992, the D. family moved to Atlanta, Georgia. Defendant and his family lived in the Atlanta area.

In the mid-1990s, Denise began coaching defendant, his brother, and their two female cousins in music and vocal performance. The four sang together. After several years of coaching this group, Denise and Barry decided they would sponsor their musical careers. They purchased a bus to allow defendant and his brother and cousins to travel to churches and other organizations to perform gospel music. They also purchased a residence in Atlanta for the brothers to serve as a studio and to allow them to write and record songs. Barry testified that his family grew "very close" with defendant and his brother, and that the brothers would probably refer to him and his wife as their "godparents." They went on vacations together and enjoyed a very close personal as well as professional relationship. Defendant would often babysit Denise and Barry's children, which included Julian and his two sisters.

At some point, the D. family moved to New York. By this time, Denise and Barry were sponsoring the musical endeavors of

only defendant and his brother, with the two cousins no longer being involved. As Julian approached high school age, his parents determined that he should attend Teaneck High School. They purchased an apartment in Teaneck to enable Julian to attend the school, which he began in 2009 as a freshman. In the Spring of 2010, Denise and Barry invited defendant and his brother to move from Atlanta to the New York area to live in the Teaneck apartment. Defendant would often drive Julian from his school to his parents' apartment in New York. On other occasions, Julian would often go to the Teaneck apartment while waiting for his mother to pick him up. Additionally, defendant would often drive Julian to places he needed to go when his parents were not available.

Julian played on his high school baseball team, and a banquet was scheduled for a date in June 2010 to celebrate their recent successful season. On the night of the banquet, Denise called defendant and asked him to pick Julian up at school and take him to the banquet. Defendant agreed to do so. Defendant testified at trial that he picked Julian up, drove back to the Teaneck apartment, and, at Julian's request, they played basketball for a while. They went back to the apartment, and defendant took a shower. It is at this point in the description of the events, that defendant's version and the version to which Julian testified diverged.

According to defendant, while he was in the shower, Julian yelled at him to hurry because he was concerned he would be late for the banquet. When defendant finished his shower, Julian yelled at him again to get ready to leave. Defendant said that Julian then grabbed him and they "tussled for a little bit." They then left for the banquet. On the way, defendant said Julian was very concerned about being late, and was urging defendant to drive faster and run red lights. Julian was also texting his friends who were already at the banquet and was upset with defendant for being late. When they arrived, defendant offered to go inside to see if Julian's teammates were still there. Defendant went in and came back and reported to Julian that only a few of them were there, he was not that late and he should go inside. However, defendant said Julian refused to go in and asked defendant to drive him home to New York and defendant did so. Later that night, defendant received a call from Denise and Barry, admonishing him for not getting their son to the party on time and upsetting him.

According to Julian, when defendant came out of the shower he "tackled" him, "pulled down [his] pants and anally penetrated [him]." Defendant was then momentarily distracted by a noise from outside the apartment and Julian was able to escape his grasp. Julian said he then left the apartment and waited by the car. Defendant then came out and drove him to the banquet. When they

7 A-3820-14T2

arrived, Julian said he felt sick and wanted to go home. Defendant drove him back to his parents' apartment.

Julian did not tell anyone about this incident in its immediate aftermath. When his father questioned him as to why he did not go to the party, Julian said he was afraid to say what happened and was in shock from the incident. Julian testified that his clothes had blood on them and he took them off at this parents' apartment and threw them down a trash chute. Julian said he never told his parents about this as time went by because he assumed it was his fault for playing basketball with defendant rather than going to the banquet on time, and he thought his parents would be angry with him.

After June 2010, Julian's demeanor changed. He became introverted and depressed, and he struggled at school. A counselor from Teaneck High School contacted Julian's parents. The counselor stated that because of Julian's behavior and poor grades, he was questioned in an effort to ascertain the problem, and Julian revealed to them another incident of sexual abuse by defendant that he claimed occurred when they were living in Atlanta and he was seven years old. Julian said that defendant attempted unsuccessfully to anally penetrate him with his penis. On that occasion, he never told anyone even though he knew something bad had happened. He came to believe that nothing like that would

ever happen again, and was living with it.[2]  Barry then had a talk with Julian, trying to ascertain why he never disclosed the prior incident.  Julian said he believed it was his fault, and he was afraid his father would be ashamed of him if he knew what happened. Barry made the decision not to tell his wife and not to tell anyone.  He made arrangements to prevent his son and defendant from being alone in the future.

At about this time, Julian's parents also made the decision to transfer him from Teaneck High School to a private school, Dwight-Englewood School.  Julian did not perform well there, and he did not like the atmosphere or the athletic programs.  He wanted to go back to Teaneck High School.  Julian's father continued to be assertive with him about performing better in school and setting goals for himself in order to succeed.

It is noteworthy, and relevant to the defense in this case, that both of Julian's parents were highly educated at prestigious schools and were very successful in their respective careers.  They had achieved a significant level of affluence.  The defense theory at trial was that Julian was under constant pressure from his parents to succeed, to be able to get into a prestigious college,

---

[2]  On the State's pretrial motion, evidence of this prior incident was allowed in evidence for a limited purpose, accompanied by a limiting instruction.  Defendant does not appeal from that evidence ruling, and it is not germane to the appeal.

and to follow in their footsteps. The defense contended that Julian was unable to meet these expectations, which caused his depression, change in demeanor, and downward performance in school. Finally, Julian fabricated the allegations about the prior incident in Atlanta and the Teaneck incident that is the subject of this case.

In early 2012, after again meeting with the school counselor, Barry asked his son if there was something else bothering him. He asked if anything happened in Teaneck that he wanted to talk about. According to Barry, Julian, with tears in his eyes, told him that defendant had "jumped [him] and raped [him]." Barry informed the counselor of the situation. The counselor, as legally required, reported the matter to the police. These charges followed.

At trial, there were only three witnesses, Julian, his father, and defendant. Defendant denied attacking Julian in Atlanta and, with respect to the allegations in Teaneck, he described the events as we have set forth.

## II.

In the jury selection process, the court read the indictment to the jurors, but did not elaborate further about the factual allegations in the case. The judge used a standard jury questionnaire. He addressed the panel and went over the questionnaire with them, instructing them to record a "yes" or

"no" answer to each question.  A "yes" answer would reflect that the subject matter would have to be discussed with the court and counsel.  A "no" answer meant there would be no discussion on that topic.

The judge called each prospective juror to sidebar and first ascertained whether they had answered any of the standard questions in the affirmative.  If so, there was discussion to elicit further information and determine whether the juror should be qualified.  Of course, if not disqualified for cause, the attorneys would have the opportunity to consider the information in deciding whether or not to exercise a peremptory challenge.  The judge would then ask a series of questions about the prospective juror's reading materials, television and internet habits, place of residence, family circumstances and employment, and the like.  And, if nothing problematic came up, he would instruct the prospective juror to take the next seat in the jury box.

Among the standard questions addressed to the panel were these:

> Is there anything about the nature of the charge itself that would interfere with your impartiality?
>
> . . . .
>
> Have you or any family member or close friend ever been the victim of a crime whether it was reported to law enforcement or not?

. . . .

Is there anything about this case, based on what I told you, that would interfere with your ability to be fair and impartial?

. . . .

Is there anything not covered by the previous questions which would affect your ability to be a fair and impartial juror or in any way be a problem for you serving on this jury?

. . . .

Is there anything else that you feel is important for the parties in this case to know about you?

A.E. did not respond affirmatively to any of those questions. She was not challenged for cause or peremptorily. She was seated as juror #4 and became one of the deliberating jurors. We know from the voir dire transcript that A.E. had three children, the oldest of which was twenty-one years old at the time of trial. Therefore, although the record does not reflect her specific age, we can assume that she was at least in her forties. It was A.E. who ultimately disclosed to her fellow jurors during deliberations the details on an incident that happened to her when she was thirteen years old.

The jury returned its guilty verdict on October 15, 2014. On October 20, 2014, juror #9, J.A., called defendant's attorney and

told him that one of the jurors had been the victim of a sexual assault when she was young, which she did not disclose during voir dire, and which she discussed with the deliberating jurors. Defense counsel immediately called the prosecutor and the court to inform them of this. After consultation with both counsel, the judge decided to bring J.A. into court to be interviewed on the record in the presence of both counsel.[3] This occurred on October 23, 2014.

During preliminary colloquy, before bringing J.A. into the courtroom, defense counsel described what J.A. had told him. She said that from the outset of deliberations, A.E. "was for a guilty finding for [defendant] and the other people said you know, we have to go over the -- the evidence. We have to, you know, discuss this, you know, before we make any decision." She said A.E. continued to conduct herself in this manner throughout deliberations, and then "said that she had been molested as a youth. And then the jury -- the deliberations went on from there and came to a conclusion."

Defense counsel laid out a two-pronged argument as follows:

> [I]f this information was given to the jurors did it in some way influence them?

---

[3] Throughout these juror interviews, defendant's appearance was waived.

But I don't think we even have to get to that point because it's -- the other prong is what we heard. This was not disclosed at sidebar or at any time in the various questions that are asked by the Court. You know, have you been the victim of a crime? Is there anything about the charges that -- you know -- that make[s] you uncomfortable or something to that effect. And even before the jurors were sworn, there's -- like -- that last statement is there anything that we should know and all that kind of stuff.

So my feeling is that -- that if this woman, juror number 4, does admit that she told the other jurors this, she didn't tell us this. And I think that, right there, in itself, would be cause to order a new trial for [defendant].

Counsel reiterated that without even assessing whether A.E's revelations influenced the jurors, he also believed he was entitled to a new trial because he clearly would have exercised a peremptory challenge if she had disclosed this information during voir dire:

The point being that without this revelation coming to us, when it should have come to us, either the Court would have excused for cause or I would have used a challenge to -- to get rid of [A.E.], if she had told us this ahead of time. I think that's what the whole case is really about -- the whole matter.

J.A. was then brought into the courtroom and began her interview by saying that the disclosure occurred on the last day of deliberations right after lunch. At that time, juror #7, M.V., spoke to the other jurors. M.V. had just had lunch with A.E. She

A-3820-14T2

said that M.V. told the jurors that A.E. told her during lunch that she always voted guilty whenever a vote was taken without any explanation or discussion, and now she knew why. M.V. informed the jurors that A.E. "told me a story why, you know, she feels the way she does and it's because something similar happened to her as a child." M.V. said that a number of jurors did not want to listen to this information, but M.V. "kept on telling the story," and when J.A. said something to M.V. "she got angry at me. I said, you know, this really has nothing to do with what's going on here. And then she says of course it has something to do with what's going on here."

A.E. then took over the conversation and proceeded to personally tell the story of her prior incident. Synthesizing A.E.'s testimony and the testimony of the various other jurors, this is the story.

A.E.'s parents were separated. She was living with her father, who then moved in with a girlfriend, who had five children. Four of them were younger than A.E. The oldest child, a boy, was older than A.E., but the record does not disclose his exact age.

As A.E. described it, one day he said to her "if you get up [from bed] I'm going to, you know, I guess do, you know, try to have sex with me." For the next day or two, A.E. said when she woke up in the morning she needed to use the bathroom but was

15                                                          A-3820-14T2

afraid "that that could happen." She then said what happened after the third day:

> So, you know, nothing happened for three days because I never got up. So then finally I did and I came out of the bathroom, I walked out and he was there waiting for me. So then -- so then he tried, you know, and then I yelled for my dad and he came and he goes oh, what's the matter, I said nothing. You know, I said oh, no, you know, Michael, you know, he scared me because when I came out of the bathroom. And so nothing happened but, you know, but that's, you know. But then my father, I told my father eventually and like in this case, you know, he didn't do anything. He told me, you know, all right, it's time for you [to] go. So I went to live with my mother and the kids and his girlfriend stayed there and that was it.

We note that in her in-court interview, A.E. avoided using graphic terms or descriptions. However, we infer that when describing the events to her fellow jurors, she did use such terms and descriptions. Several of the other jurors, in their interviews, used more graphic terms. For example, juror #6, S.M., said that A.E. described that when "she got up in the middle of the night and one of the brothers said I'm going to rape you or something similar, I'm going to f[_ _ _] you, something to that extent." Similarly, juror #14, H.P., said that A.E's "stepbrother . . . kept on telling [her] when they were little oh, you know what, I'm going to F—U, whatever." Juror #3, A.H., described how someone in A.E.'s house tried "to rape her." When pinned down as

16

to whether she actually used the word "rape," the juror said "it was either molest or rape, something like that, that he tried to attack her sexually but it didn't happen."

Common experience and common sense tell us that these jurors would not have used these graphic terms to describe to the judge in court on the record what A.E. said if A.E. had not used such graphic terms in the deliberation room. Conversely, it is understandable that A.E. and some of the other jurors, while testifying in their in-court interviews, avoided using the graphic terms in describing the events.

When A.E. was asked why she disclosed this information to the jury, she said she told M.V. the story during the lunch break and M.V. urged her to share this with the other jurors

> because three -- three jurors couldn't decide, they were like, you know, not guilty they said and [s]he goes maybe this will help them decide. So I said all right, I'll say it, you know, but nothing happened but, you know.

The judge then asked A.E. why she had not disclosed this information during voir dire, particularly in response to the standard question inquiring whether she had been the victim of a crime. A.E. responded:

> Yeah, I figured because it was a long time ago, I didn't really think, you know, I didn't really think about it at the time really, you know, because it happened so long ago.

17

Twenty minutes after M.V. and A.E. conveyed the revelations to the other jurors about A.E's past experience, the jurors reached a unanimous guilty verdict. As the court noted during A.E.'s testimony, "[A.E.]'s saying that there were three people unsolicited that were not guilty and then juror number 9 said right after this they all went the other way."

In the process of excusing A.E. at the conclusion of her interview, the judge politely told her, referring to her failure to disclose the information during voir dire, that he knew "sometimes sharing things like that are difficult," to which A.E. responded, "Right." The judge then said "And I realize what you're saying now is that nothing actually did happen . . . so that maybe in your mind that didn't make you a victim of a crime or things like that." A.E. again responded to this leading question, "Right."

When M.V. was interviewed, she described how A.E. told her during the lunch break that "I had something happen to me once," when the teenage son of her father's girlfriend "threatened her, like he said something about if you get up in the middle of the night I'm going to get you or something like that and she was afraid." And then, a couple of days later when she got up, "he was waiting there for her," and "nothing happened but it scared

the hell out of her and she told her father, not right away though. She didn't tell him right away which I thought was interesting and on point with what we were talking about." Then, her father "made her live with her mother instead of siding with her."

M.V. said she thought it was relevant because "it really illustrated that not all parents when they hear something are going to take the kid's side," and "[t]here was one juror in particular who I'm probably -- I'm pretty certain is the one who brought all this up who from the beginning was like if something happened to me I'd go to the police and if -- and if they didn't go to the police right away then it didn't happen."

Several jurors thought A.E. was wrong for revealing this information and expressed their belief that she should have excused herself and not been a member of this jury in the first place. As we stated, the court asked all of the jurors toward the end of their interview whether this information affected their verdict or whether they decided the case based on the evidence. They all said the information did not affect them and they decided the case based on the evidence. We do note that at least one of the jurors, juror #8, C.G., equivocated on the point. She said: "I don't think it affected my decision," but then continued that "it didn't really affect my decision but I do think it wasn't something that was appropriate" to be discussed among the deliberating jurors.

19

Juror #6, S.M., made these comments:

> And no act actually took place, there were,
> you know, a million reasons why it doesn't
> matter.  So we continued our deliberations and
> within five or 10 minutes the woman to my right
> said but listen to what happened to [A.E.].
> And the woman who was sitting next to me just
> to my left . . . she said but that has nothing
> to do, we're not trying your case, we're
> trying this case.  And so on our end of the
> room we -- again, we started talking amongst
> ourselves it's completely irrelevant, we don't
> care, but it did concern us that there was no
> way [A.E.] would ever go not guilty, there was
> no way, she was -- we believed that she was -
> - she -- and she said I won't say not guilty
> because of my own past experience.

The judge asked whether A.E. "actually said those words."  Juror

#6 replied:

> Yeah, and it was problematic for us.  It --
> in the end, we just didn't include her in any
> -- she never spoke and we didn't include her
> in any deliberations, we never asked her any
> questions after that, we never asked her her
> opinion on anything.

Juror #13, M.D., said this: "I think to my understanding that

made [A.E.], you know, be on the side of guilty because of such

experience."  When asked why she thought that, M.D. said: "Because

that's how it was talked to, it's like the comment of that, the

jurors was -- the comment of that, the jurors was, because of that

experience she had then where else she will go but to the guilty

side."  When asked whether A.E. had actually said that, M.D.

answered in the negative, but said that was the "feeling of the other jurors."

Juror #14, H.P., told the judge that when all of these discussions were taking place, she said, "if I had a situation like that I would have brought it up in one of your questions. I think it was clear if there was something in there I should have brought it up as possibly a concern and at the very least you should have excused yourself."

The judge rendered an oral decision on February 26, 2015. He reviewed the testimony of each of the twelve jurors. He noted that all of them stated that the revelation of A.E.'s prior experience did not affect their verdict, which was based solely on the evidence. Indeed, A.E. said the same. The judge further noted that A.E. did not engage in wrongdoing by withholding this information during voir dire because "[s]he didn't view herself as a victim of a crime. Nothing had happened." The judge discounted the testimony of juror #6, S.M., that A.E. had said she could never vote for not guilty because of her past experience, because no other juror corroborated that A.E. had actually said that.

As to A.E.'s non-disclosure of the information during voir dire, the judge said:

> There is no[] juror misconduct at the point of not answering the question, because she wasn't asked specifically perhaps about sexual harassment, but whether she was the victim of a crime. The other questions pertain to any voluntary disclosures or disclosures if they're going to -- if something's going to affect their verdict. She didn't feel it was going to affect her verdict. So at that moment there was certainly nothing that the juror did that was wrong.

The judge found that A.E.'s non-disclosure was "unfortunate," and not something "to be condoned or encouraged." Thus, he essentially concluded that A.E. made an innocent mistake. The judge denied defendant's new trial motion.

In the course of his decision, the judge did not address defendant's argument that, had the information been disclosed during voir dire, and if A.E. was not excused for cause, defense counsel would have used a peremptory challenge to excuse her.

### III.

"When a juror incorrectly omits information during voir dire, the omission is presumed to have been prejudicial if it had the potential to be prejudicial." State v. Cooper, 151 N.J. 326, 349 (1996), cert. denied, 528 U.S. 1084, 120 S. Ct. 809, 145 L. Ed. 2d 681 (2000). Nevertheless, a litigant still must demonstrate that "had he or she known of the omitted information, he or she would have exercised a peremptory challenge." Ibid. (citing Wright

v. Bernstein, 23 N.J. 284, 294-95 (1957)). It is not relevant that the failure to disclose may have been innocent or inadvertent. Wright, supra, 23 N.J. at 295-96.

Failure of a juror to disclose potentially prejudicial information during jury selection is regarded as an event denying the affected party a fair trial. In Re Kozlof, 79 N.J. 232, 239 (1979). This is "not necessarily because of any actual or provable prejudice to his case attributable to such juror, but rather because of his loss, by reason of that failure of disclosure, of the opportunity to have excused the juror by appropriate challenge." Ibid. To warrant reversal, it is only necessary to demonstrate that "had [the defendant] known of the omitted information, he or she would have exercised a peremptory challenge to exclude the juror." Cooper, supra, 151 N.J. at 349. "Absent an affirmative showing that a litigant would have exercised a peremptory challenge to exclude a juror, the voir dire omission is harmless." Id. at 350.

We do not agree with the trial court's assessment of A.E.'s failure to disclose the information. First, whether she acted in good faith, and whether her non-disclosure was innocent or inadvertent, is irrelevant. It is the effect on the ability of defendant to have a fair trial that is dispositive. The motivation

23                                                    A-3820-14T2

of the non-disclosing juror does not add to or detract from that result.

Second, we view as more significant what actually happened to A.E. when she was thirteen years old. We do not view this as some relatively insignificant "sexual harassment" that was not actually a crime. A.E.'s older household member had expressed his intention to have sex with her against her wishes. He probably made his intentions known in graphic terms by telling her that he was going to "rape" her or "f_ _ _" her. She was placed sufficiently in fear that she did not come out of her bedroom when she needed to use the bathroom for several days. When she finally used the bathroom, he "accosted" her with a sufficient demonstration of purpose to carry out his threat that it caused her to scream, which enabled her father to come to the rescue and prevent anything further from happening.

He certainly placed A.E. in fear, as one juror put it "scared the hell out of her," and may have committed a terroristic threat. See N.J.S.A. 2C:12-3a. The record does not disclose whether there was any physical contact before A.E.'s father arrived. We will not speculate whether he touched A.E's intimate parts, which could have constituted criminal sexual contact. See N.J.S.A. 2C:14-3 and N.J.S.A. 2C:14-1(d) and (e). He may have taken a sufficiently substantial step in the course of conduct by which he planned to

24

engage in unwanted sexual activity with A.E. to have committed an attempt to commit sexual assault or criminal sexual contact. See N.J.S.A. 2C:5-1a(3).

The perpetrator's conduct against A.E. was sufficiently egregious that it should have alerted her to respond affirmatively to one of the questions we previously set forth. Indeed, during deliberations, she thought it sufficiently relevant to share it with her fellow jurors. Many of them felt it was sufficiently significant that it should not have been brought up during deliberations and that A.E. should have excused herself from serving on this case. Finally, we note that when A.E. was asked an open-ended question about why she did not disclose it, she said it was because it happened such a long time ago. It was not until a leading question was posed to her suggesting that she did not think of herself as the victim of a crime because "nothing happened" that she responded, "Right."

This information should have been disclosed during voir dire. All prospective jurors knew what the subject of the trial would be. Each count of the indictment recited Julian's date of birth, and the jurors therefore knew his age at the time of the alleged offense, an age strikingly similar to that of A.E. at the time of her experience.

We have no hesitancy in concluding that a sufficient showing has been made that, had this information been disclosed, either the court would have excused A.E. for cause, or any reasonable defense counsel would have surely used a peremptory challenge to excuse her. We therefore conclude that defendant was denied a fair trial

> not necessarily because of any actual or provable prejudice to his case attributable to [the non-disclosing] juror, but rather because of his loss, by reason of that failure of disclosure, of the opportunity to have excused the juror by appropriate challenge, thus assuring with maximum possible certainty that he be judged fairly by an impartial jury.
>
> [Kozlof, supra, 79 N.J. at 239.]

Our conclusion on this point makes it unnecessary for us to determine whether the judge's finding of no actual prejudice is supported by the record. We realize that the trial court is entitled to substantial deference in assessing the credibility of the jurors who testified before him. That deference is not unlimited, and we will not uphold the findings if they are clearly mistaken. See State v. Hubbard, 222 N.J. 249, 269 (2015) (citing State v. Locurto, 157 N.J. 463, 470-71 (1999)). As stated, we find it unnecessary to conduct that analysis in this case.

For the sake of completeness, we address defendant's first three points of argument. In Point I, defendant argues that the court erred in denying his request to display to the jury a videotape of Barry's statement to the police. Defendant contends it would have shown that he was not particularly emotional when describing what happened to his son. Defendant argued that this would be relevant because in his trial testimony, Barry became quite emotional in describing these events, and comparison with the videotape would have impugned his credibility. Defendant contends it would have demonstrated to the jury that his emotions before them were manufactured, and he was thus providing his testimony with an intent to deceive them.

The judge viewed the videotape out of the jury's presence. He concluded that Barry's demeanor was basically the same as when he testified at trial. Further, in his trial testimony, Barry acknowledged that although he cried while testifying in court, he had not cried when giving the statement to the police, although he said he was a bit choked up at that time.

We defer to the trial judge's assessment of the probative value of the tape. Evidentiary decisions by a trial court are subject to "limited appellate scrutiny, as they are reviewed under the abuse of discretion standard." State v. Buda, 195 N.J. 278,

27                                                    A-3820-14T2

294 (2008).  We have no occasion to find an abuse of discretion here.

In his second point, defendant contends the prosecutor was impermissibly allowed to cross-examine defendant regarding his silence at the time of his arrest and to refer to that cross-examination in her summation to that testimony.  This argument was not raised in the trial court, and we are therefore guided by the plain error standard, under which we will not reverse on the ground of such error unless the appellant shows that the error is "clearly capable of producing an unjust result."  R. 2:10-2.  Not any possibility of an unjust result will suffice; the possibility must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

Indeed, not only was there no plain error, but there was no error.  The "silence" defendant refers to on appeal was actually a series of inconsistencies or failures to disclose information when he made a voluntary statement to the police after waiving his Miranda[4] rights.  The prosecutor was merely pointing out inconsistencies in that defendant left out some facts in that

---

[4]  Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

statement as compared with his trial testimony. The prosecutor had not introduced defendant's statement in her case-in-chief, as it was basically exculpatory. However, the judge ruled that the statement was voluntarily given, which made it fair game in cross-examining defendant if he chose to testify. State v. Kucinski, 227 N.J. 603, 620-21 (2017).

Finally, in Point III, defendant complains that, in her summation, the prosecutor exceeded permissible bounds in emphasizing the serious impact of defendant's alleged conduct on Julian and his family and urging the jury to convict in order to send a message to the community. Again, there was no objection at trial and we are guided by the plain error standard. In our view, both aspects of this argument pertain to legitimate responses by the prosecutor to arguments defense counsel made in his summation, and they did not exceed permissible bounds.

Failure of an adverse party to object at trial is an indication that counsel did not deem the comments prejudicial at the time. State v. Vasquez, 265 N.J. Super. 528, 560 (App. Div.) (citing State v. Johnson, 31 N.J. 489, 511 (1960)), certif. denied, 134 N.J. 480 (1993). Further, failure to object deprived the court of ruling on the issue and, if appropriate, ordering the comments stricken and issuing an appropriate curative instruction.

For the reasons expressed in Part III of this opinion, defendant's conviction is reversed and the matter is remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3820-14T2